DIXON, Justice.
 

 •In June of 1969 the plaintiffs filed three suits against the City of New Orleans. They were consolidated for trial, and judgment was rendered on July 11, 1969 in the trial court. Each petition prayed for a mandamus, ordering the city to implement the provisions of Acts 55 and 57 of the Extra Session of 1968 (No. 494-226 is referred to as “the vacation case;” No. 494-227 is referred to as “the longevity case;” No. 494-228 is referred to as “the minimum salary case.”). The trial court overruled exceptions, sustained the demands of the plaintiffs, and ordered the city to comply.
 

 The city appealed and on January 12, 1970 the Court of Appeal affirmed the trial court (see New Orleans Firefighters Association et al. v. City of New Orleans et al., La.App., 230 So.2d 326).
 

 On March 12, 1970 this court denied the application of the city for writs to review the Court of Appeal decision.
 

 On August 12, 1970 plaintiffs filed á motion in the consolidated cases in the district court seeking to have the city, the mayor and the council of New Orleans adjudged guilty of contempt of court for failure to comply with the previous judgment in the mandamus suit. The motion for contempt in 494-226 (the vacation case) was dismissed. The motion for contempt in 494-227' (the longevity case) was “maintained to the - extent of finding the defendants, the City 'of New Orleans, the Council of the City of New Orleans in
 
 *656
 
 contempt . . the said contempt being, however, not wilfully committed by said defendants.” In
 
 494-228
 
 (the minimum salary case), the judgment was rendered against the city in the same words as those used in 494-227.
 

 • The firemen and the city both appealed the adverse judgments. The judgments of the district court which found the city in 'contempt were reversed. The judgment of the district court in the vacation case, which found the city was not in contempt, was affirmed. (New Orleans Fire Fighters Association Local 632 et al. v. The City of New Orleans et al., La.App., 260 So.2d 779).
 

 In the longevity and minimum salary cases, the Court of Appeal held that “wilful disobedience is an essential ingredient of the contempt itself and without such a finding there can be no finding of constructive contempt.” 260 So.2d 779, 786. This was the only ruling of the district court with which the Court of Appeal disagreed. The Court of Appeal agreed with the district court that the city’s failure to comply with the court’s prior judgment did not constitute “wilful” disobedience. Upon this finding, the Court of Appeal remanded the longevity and minimum salary cases for the trial court to set a reasonable time within which to comply, or face contempt proceedings “as authorized in LSA-C.C.P. art. 225 et seq.”
 

 Whereupon, both plaintiffs and defendants applied to this court to review the judgment of the Court of Appeal. Because the matter was clothed with a great public interest, and because both parties requested clarification of the issues between them, we granted writs on June 29, 1972.
 

 The principal argument upon which the city bases its claim for relief from the judgments in the mandamus suits ordering the city to comply with the provisions of Act 55 (amending R.S. 33:1992) and Act 57 (amending R.S. 33:1996) of the Extra Session of 1968 ..and Act 132 pf }$62 (which also amended R.S. 33:1992) ..arises because of an apparent .conflict between a decision of this court and the 1-970 decision of the Court of Appeal affirming- the trial court in the mandamus suits.' (New Orleans Firefighters Association Local 632 et al. v. City of New Orleans et al., La.App., 230 So.2d 326).
 

 In March of 1971 this court decided Louisiana Civil Service League et al. v. Forbes et al., 258 La. 390, 246 So.2d 800. In the Forbes case the trial court had held Act 33 of
 
 1970
 
 unconstitutional as violative of Article 14, Section 15 of the Louisiana Constitution. Act 33 of 1970 purported to establish certain minimum salaries for the state police. The trial court was of the opinion that the salaries of all employees who are under civil service were governed by the civil service amendments to the Louisiana Constitution. -
 

 
 *658
 
 Because the district court had found an act of the legislature unconstitutional, we were required to review the matter. We held that “Act 33 of 1970 is not supplementary to the Civil Service Amendment; it is in conflict with it because it ascribes to the Legislature a power which was taken away from it by the electorate’s adoption of a constitutional amendment. . . .” (246 So.2d at 808).
 

 We also referred to New Orleans Firefighters v. City of New Orleans, supra, and found that case not controlling. We quoted with approval from the district court’s opinion where the cases were distinguished on the basis of the difference in the relationships among state police, the state civil service commission, the legislature and the governor, on one hand, and the firemen, the city civil service commission and the city council on the other.
 

 The great and apparent similarity between the cases arising from legislative efforts to increase the pay of the state police and that of the firemen, since both are controlled by the same constitutional provision, furnishes the substance of the city’s defense. Because this court found in the Forbes case, supra, that the legislative efforts to raise state police pay conflicted with Article 14, Section 15 of the Louisiana Constitution, argues the city, it must follow that the legislative efforts to increase the pay and benefits of firemen are also unconstitutional.
 

 Res judicata
 

 That question, however, is not before us. The judgment in New Orleans Firefighters v. City of New Orleans, La.App., 230 So. 2d 326 (1970) has become final. The City of New Orleans is now barred by “the authority of the thing adjudged” (C.C. 2286) from defending on the basis of the unconstitutionality of the legislative acts involved.
 

 The 1970 Court of Appeal decision in those cases affirmed the judgments of July 11, 1969 of the district court, and became' final and executory upon the denial by this court (255 La. 557, 232 So.2d 78) of applications for writs of certiorari. C.C.P. 2167; Article 7, Section 11, Louisiana Constitution. The district court had tendered judgments in favor of the firemen plaintiffs and against the city defendants.
 

 In No. 494 — 226 the district co]iri;.ordered the defendants to implément R.S. 33:1996 as to vacations and to appropriate a sum sufficient to pay for the vacation periods.
 

 The district court judgment in No. 494— 227 ordered the defendants to implement R.S. 33:1992 as to longevity pay increases and to appropriate the necessary funds.
 

 In No. 494-228 the defendants were ordered to implement the pay provisions of R.S. 33:1972 “as of January 1, 1969,” and to make the necessary appropriation.
 

 In spite of the finality of the 1970 Court of Appeal judgment, when plaintiffs
 
 *660
 
 sought to enforce the judgments by contempt proceedings the defendants again argued the unconstitutionality of the amendments to R.S. 33:1992 and 1996. The constitutional issue had been raised by defendants in the district court in the mandamus actions and decided adversely to them there and in the Court of Appeal.
 

 To meet the constitutional defense, plaintiffs rely upon the authority of the thing adjudged.
 
 Res judicata
 
 is available to plaintiffs. See State v. American Sugar Refining Co., 108 La. 603, 32 So. 965 (1902); O’Quin, Res Judicata — “Matters Which Might Have Been Pleaded,” 2 La. L.Rev. 347, 360 (1939-1940).
 

 The essential elements of
 
 res judicata
 
 are described in C.C. 2286:
 

 t“The authority of the thing adjudged takes place only with respect to what was the object of the judgment. The thing demanded must be the same; the demand must be founded on the same cause of action; the demand must be between the same parties, and formed by them against each other in the same quality.”
 

 The parties before us arc the same and are here only because the district court and Court of Appeal have found that the defendants have failed to carry out, in two cases, the judgments rendered against them on July 11, 1969. The demand in the contempt actions is “founded on the same cause of action.” The “object of the judgment,” the “thing demanded,” the
 
 “cause,”
 
 is the same — the implementation of R.S. 33:1992 and 1996. As Pothier says, “It .is the same horse.”
 
 [1]
 

 
 *662
 
 In State v. American Sugar Refining Co., supra, the State sued to collect license taxes for 1900 and 1901 under Act 171 of 1898. The defense raised was an exemption for “manufacturers” under the Constitution. The plaintiff filed a plea of
 
 res judicata
 
 based on a previous suit for taxes claimed to be due for the year 1898 and previous years. The defense in the prior suit was that Act 150 of 1890 (virtually the same as Act 171 of 1898) was not applicable to defendant, who enjoyed the constitutional exemption as a manufacturer. The State won the earlier suit when the Supreme Court held that the defendant sugar refiner was not a “manufacturer.” State v. American Sugar Refining Co., 51 La. Ann. 562, 25 So. 447. The State lost the later suit when the court overruled the plea of
 
 res judicata
 
 and held that the refiner
 
 ivas
 
 a manufacturer.
 

 The reason given in State v. American Sugar Refining Co., supra, for overruling the exception of
 
 res judicata
 
 was that the thing demanded and the cause of action were not the same in the two suits. Examples given by the court illustrate the correctness of its conclusion.
 
 [2]
 

 In the case before us, the identity of the parties, the thing demanded and-the cause require the sustaining of plaintiffs’ plea of
 
 res judicata.
 
 As between these litigants, we will not again inquire whether R.S. 33:1992 and 1996 violate Article 14,
 
 *664
 
 Section 15 of the Louisiana Constitution of 1921.
 

 ■■“The basic principle of res judicata is found in the necessity that a time should come when the litigation shall cease, in order, that the decree of the court may be carried out. This is what the law .concerns itself with, that the object of the judgment shall not remain eternally in suspense, but be delivered into the quiet and undisturbed possession of the successful litigant. This is what the Code means when it says that ‘The authority of the thing adjudged takes place only with respect to what was the object of the judgment.’ ” 32 So. 966.
 
 Prescription
 

 We do not now decide whether
 
 res judicata
 
 prevents the consideration of defendants’ plea of prescription.
 
 [3]
 
 Prescription was not pleaded in the mandamus suit. Prescription was not pleaded in the contempt proceedings, until in the Court of Appeal.
 

 Prescription must be specially pleaded; the court cannot supply the objections of prescription. C.C.P. 927. It may be pleaded in the trial court prior to submission
 
 *666
 
 (C.C.P. 927) and in the appellate court “if pleaded prior to a submission of the case for a decision . . . .” C.C.P. 2163. In these cases the plea of prescription was not filed by defendants until October 4, 1971, in the Court of Appeal in the contempt proceeding. The defendants chose not to raise the defense of prescription until long after the judgments in the mandamus suits became final. Now it comes too late for consideration. This contempt action is in the same suit as the original mandamus suit, and is merely an effort by the successful plaintiffs to enforce their judgment. The city cannot now urge a defense which it has tacitly waived.
 

 This conclusion is compatible with the only analogous
 
 [4]
 
 case found in Louisiana. In State v. Clinton and Port Hudson Railroad Co., 21 La.Ann. 156 (1869), there was a contest between a creditor and the liquidator of the defendant railroad over interest on the creditor’s claim which extended over a period of several years. Early in the liquidation proceedings the railroad’s ■commissioners had filed an accounting. The creditor Hawford filed an opposition because no interest had been allowed on his claim. There was a judgment on February 11, 1854 dismissing the opposition .and homologating the account.
 

 When the final account of the liquidator was filed, Hawford again opposed the account, and obtained a judgment for $500.00
 
 with 8%
 
 interest, and privileged rank. The judgment was obtained on November 26, 1858. There was no appeal and the judgment became final.
 

 Then on June 7, 1867 Flawford ruled in the liquidator to show cause why Haw-ford’s judgment should not be paid as a privileged claim, to which the liquidator pleaded the judgment of February 11, 1854 (which ruled against the claim for interest) as a bar. The ruling of the Supreme Court was:
 

 “The judgment of the eleventh of February, 1854, might have been used as a defense against the allowance of interest on the trial of the opposition to the liquidator’s account in 1858. It cannot be set up now. The defendant will not be permitted to go behind that judgment and urge the defense which should have been made at the time.” 21 La.Ann. 156.
 

 Our procedural statutes prevent the defendants, in this contempt action which seeks to enforce a final judgment, from pleading prescription, a defense available to them in the mandamus suit but not urged.
 

 Laches
 

 The city argues that plaintiffs are precluded by “laches” from recovery on certain of their demands.
 

 
 *668
 
 The first time defendants raised the defense of “laches” was in the city’s “Implementation Plan” filed in the district court September 28, 1970 in compliance with a stipulation between plaintiffs and defendants filed August 27, 1970 in the contempt proceedings. As an alternative to defendants’ plea that the city was in compliance with R.S. 33:1992 and 1996, the “Implementation Plan” concluded with a contention that it should be relieved of responsibility for payment of longevity pay increases prior to July 20, 1969, when these suits were filed, because of “the failure of plaintiffs ... to assert their claims . . . prior to the filing of suit.” No other factual allegation is made.
 

 Defendants do not complain that the
 
 contempt proceeding
 
 came too late, but that plaintiffs made their original demands in the mandamus actions too late. Defendants cannot, in a contempt action to enforce a final judgment, raise the defense that plaintiffs were guilty of laches in obtaining that final judgment.
 

 “Laches” is an affirmative defense
 
 [5]
 
 which must be specially pleaded. C.C.P. 1005. See Deposit Guaranty National Bank v. Shipp, 252 La. 745, 214 So.2d 129 (1968).
 

 Peremptory Exceptions
 

 Defendants contend that their peremptory exceptions to the rule to show cause should have been sustained, citing Louisiana State Board of Medical Examiners v. England, 252 La. 1000, 215 So.2d 640 (1968). In the England case it was only alleged in the contempt rule that the defendant “failed to comply with the permanent injunction.” This was held to be insufficient to comply with the requirements of C.C.P. 225 that the “rule to show cause . . . shall state the facts alleged to constitute the contempt.”
 
 [6]
 

 There is no similarity between the pleadings in the England case and the pleadings before us. Plaintiffs’ motion for the contempt rule was articulated, containing fifteen paragraphs. In the England case, the defendant was accused of performing certain acts which violated an injunction which prohibited his practicing medicine or chiropractic. In the case before us, judgments had been rendered or
 
 *670
 
 dering' the defendants to perform certain administrative acts (providing for certain vacation periods, pay certain longevity pay increases, establish certain minimum pay standards, and to appropriate the necessary funds). The refusal of the defendants to comply with the orders of the court was specifically described in detail. The entire motion and order were served on each defendant, and adequately complies with the requirements of C.C.P. 225. The peremptory exceptions were properly overruled.
 

 Longevity
 

 The city argues before us that the longevity judgment of July, 1969 is “ambiguous and open to good faith interpretation.” The argument is based primarily on the contention that the computation of longevity in R.S. 33:1992 is based on “basic salary” and “base pay” of firemen. The city agrees that “basic salary” and “base pay” are synonymous, but argues that the city is entitled to certain “credits” in implementing the longevity pay, particularly excess millage payments under Louisiana Constitution Article 14, Section 25.
 

 The Court of Appeal referred to the city’s argument that it had complied with the pay raise judgment and the longevity judgment as follows:
 

 “We find it unnecessary at this time to discuss these issues in great detail except to say that they were based both upon the evidence in the present proceeding and upon the principle of res judicata applying to the previous judgments. An examination of the record discloses ample basis for these findings.” (260 So.2d at 784).
 

 The trial judge, in his reasons for judgment after the trial on the rule for contempt, referred to the city’s argument as follows:
 

 “On the trial of this matter in 1969 substantially the same contention was made by the city, and thus, as heretofore stated, the judgment of this Court — which rejected that argument — was affirmed and is now res judicata.”
 

 Our examination of the record in the mandamus suit and in the contempt suit affirms the correctness of this finding of the trial judge. The pay plans introduced in evidence in the mandamus suit and the pay plans introduced by the city in the contempt suit are the same. The trial court ruled in the mandamus suit that the city was not in compliance with the statutes. The city does not contend that it made any change in the pay plans in the interim between the mandamus suits and the contempt actions. Its argument now is that the district court was wrong in the mandamus suit, and that the city is actually in compliance with the statute.
 

 The city’s interpretation of the statute will not save it from conviction of contempt of the final judgment of court.
 
 *672
 
 The city is accused with the violation of the
 
 judgment.
 
 Its interpretation of the statute was adjudicated and disapproved in the mandamus suits. The Court of Appeal was correct in finding that the city had not complied with the judgment in the longevity case.
 

 Minimum Salary
 

 The city filed a “motion to correct errors” in the judgment in the minimum salary case, and complains that the Court of Appeal failed to rule upon it.
 

 The city’s motion to correct errors is merely an argument that the minimum salaries in the judgment of the district court for the various classifications were based on the actual salary then being paid to a “fireman” instead of the statutory minimum monthly salary of a “fireman” fixed in R.S. 33:1992. The minimum salary statute contained ten classifications of firemen. It fixed the monthly minimum salary of a “fireman” in subsection (1) of R.S. 33:1992 at $400.00 a month. For each subsequent classification (for engineers, lieutenants, captains, various chiefs, etc.) the minimum monthly salary was fixed at not less than a certain percentage above that of a fireman. For example, subsection (3) provides “Lieutenants shall receive a minimum monthly salary of not less than fifteen percent above that of a fireman.” If there was ever any question about the interpretation of a basis for the minimum monthly salaries for various classifications in the fire department, it was put to rest by the stipulation of the city (Placid Oil Co. v. A. M. Dupont Corp., 244 La. 1075, 156 So.2d 444 (1963)) at the trial of the mandamus rule on July 8, 1969. The attorney for the city stipulated that if the court found the minimum salaries in R.S. 33:1992 to be applicable, “that the salaries fixed for engineers would be $583, for a supervisor or superintendent of fire alarm system it would be $742, a fire alarm dispatcher would be $662.50 and a fire inspector or fire prevention inspector would be $662.50.”
 

 The stipulation removes any possibility that the “calculations” in the mandamus judgment are erroneous.
 
 Res judicata
 
 prevents the defendants from renewing their argument in opposition to the judgment. It prevents the further litigation of the city’s interpretation of the minimum salary schedule between these plaintiffs and these defendants.
 

 The city advances an alternative argument that it is in compliance with the judgment. Again, the city simply argues that the minimum pay plan should have been based on the minimum salary of a fireman fixed in the statute, rather than on the actual salary of a fireman. The city does not pretend that it is paying the schedule set out in the judgment of July 11, 1969. It cannot be in compliance with the judgment.
 

 
 *674
 

 Vacations
 

 'The firemen complain that the Court of Appeal erred in affirming the trial court’s finding the city in compliance with its July 11, 1969 judgment concerning vacations.
 

 That judgment ordered the city to implement the provisions of R.S. 33:1996 to provide:
 

 “1) A vacation period amounting to eighteen (18) days with full pay for all. employees of the Fire Department of the City of New Orleans who are employed less than ten (10) years, but more than one year as of January 6, 1969.
 

 “2) A vabation period of eighteen (18) days plus one additional day for each year of service over ten (10) years up to a maximum of thirty (30) days with full pay for all those employees of the Fire Departmént of the City of New Orleans who are employed by the City of New Orleans for more than ten (10) years.
 

 ‘.‘3) To appropriate a sum sufficient to pay for these vacation periods.”
 

 The judgment is couched in the terms of the statute itself which provides:
 

 “Firemen . . ., after having served one year, shall be entitled to an annual vacation of eighteen days with full pay. This vacation period shall be increased one day for each year of service over ten years, up to a maximum vacation period of thirty days, all of which shall be with full pay. ...” (R.S. 33:1996, as amended by Act
 
 57
 
 of 1968).
 

 The previous statute had provided for “an annual vacation of fifteen days with pay.”
 

 Because firemen work in shifts (which vary from city to city) and because of variations in practice in using vacation time on a piecemeal basis, the firemen contend that the city has failed to properly interpret the judgment ordering compliance with the new vacation law.
 

 The trial court’s opinion was that the change in the work schedules agreed upon by the firemen and the city subsequent to the July, 1969 judgment resulted in the initiation of a vacation plan which substantially complied with the requirements of the statute, and that the court could not hold the city in contempt for non-compliance. The Court of Appeal affirmed and approved the district court’s interpretation of the word “day” in R.S. 33:1995 and in the judgment of July," 1969. Because the statute was a general statute, applicable to various fire departments throughout the State, the. definition of “day” in the vacation statute must be understood in -its “most usual signification.” C.C. 14. The construction approved by the Court of Appeal was that vacation days in the statute meant calendar days, and not another kind of day (like “work day”) which might result in a variation in the application of the statute.
 

 
 *676
 
 The firemen contend that counsel for the city stipulated, upon the trial of the mandamus suit on July 8, 1969 that the word “day” in the statute meant “working day.”
 

 An examination of the record discloses that the attorney for the defendants, prior to beginning the trial of the mandamus suits, made certain stipulations, and there was the following reference to vacations:
 

 “. . . We would further stipulate that the firemen are permitted 18 days vacation annually in accordance with Civil Service Rule 8, and we have a document . . . concerning the annual leave for firemen. ...”
 

 “Mr. Barker: Mr. McNeely, would you be willing to stipulate that the days referred to in Statute means working days ?”
 

 “Mr. McNeely: Yes. It says that in the Civil Service Rule, it does refer to working days.”
 

 The preceding colloquy is not an unequivocal stipulation by counsel for the city admitting that the statute (R.S. 33:1996) was to be interpreted in the same way in which the attorney for the firemen sought to have the courts interpret it. Neither the meaning nor significance of the question is apparent from the record; nor does the answer seem to be exactly responsive. Testimony adduced seems to establish that firemen were receiving in July, 1969 eighteen days vacation (the minimum after one year’s service) but that none of the uniformed men in the fire department received more than eighteen days. Those eighteen days were, according to the witness, “working days,” but no further elaboration was given.
 

 Nor is the significance of this testimony clarified in the record. This opinion would only be burdened with an exposition of the possible interpretations applicable to the shift plans of New Orleans firemen. It is sufficient to note that the trial judge who ordered defendants to comply with the statute later found the city in substantial compliance with the judgment.
 

 There is no indication in the record before us, and none from the statute itself, that the legislature intended anything other than calendar days in R.S. 33:1996, when it established a minimum of eighteen days vacation for a fireman with one year’s service, with an increase of one day for each year of service over ten years, to a maximum of thirty days.
 
 [7]
 

 Consequently, we find no error in the ruling of the district court and the Court of Appeal, holding that the defendants are not in contempt of court for violating the
 
 *678
 
 judgment of July 11, 1969 in the vacation case.
 

 Contempt Finding
 

 The plaintiffs specify that the Court of Appeal erred in finding that “wilful conduct” is necessary before the defendants could be held in contempt. Nevertheless, in their application to us for writs and in brief, the plaintiffs interpret the instructions of the Court of Appeal to the trial court as being identical with the trial court’s conclusion on the contempt rule.
 

 In its reasons for judgment of November 27, 1970, the trial court concluded:
 

 “The Court is of the opinion that having held, as it has herein, that the City’s contention that they are in compliance with the Orders of this Court are without merit, failure to comply with the Court’s Orders, or to have such Orders (and Judgments) modified or changed by appeal, or through other proceedings, within the next ninety (90) days, would place the City in ‘wilful’ contempt of such Orders. Upon a showing so made hereafter, and after a Rule for Contempt is filed, the Court would then be authorized to proceed in accordance with the provisions of C.C.P. Article 227 and La. R.S. 13:4611.”
 

 In every respect, except actually finding the city in contempt, the Court of Appeal affirmed the trial court. It reversed the contempt decree and remanded the case to the trial court “to fix a reasonable period of time for defendants to comply with the judgments of July 11, 1969, after which, should they fail to comply, further contempt proceedings may be invoked as authorized in LSA-C.C.P. arts. 225, 226, 227, and LSA-R.S. 13:4611.” (260 So.2d at 788).
 

 We agree with the plaintiffs that the judgments of the district court and the ruling of the Court of Appeal are substantially the same. Consequently, the judgment: of the Court of Appeal in each case (No. 494-226, No. 494-227 and No. 494-228) is. affirmed. The costs in suit No. 494-226,. the vacation case (No. 52511 in this court),, are to be borne by the plaintiffs; the costs, in No. 494-227, the longevity case, and No. 494-228, the minimum pay case (No. 52519’ in this court), are to be borne by defendants.
 

 [1]
 

 . “ § IV. That it is immaterial whether the Demand be made in the same or a different Dorm of Proceeding .
 

 “[SO] Provided the three things, which are mentioned in the preceding paragraphs concur, the authority of res judicata equally attaches, whether the demand is made in the same form of action or another. ...
 

 “Several instances may be stated of this principle; suppose, for example, you proceed against me by the action quanto minoris, to obtain an abatement in the price of
 
 a
 
 horse, which you allege to have a certain fault against which I have warranted him, it is decided that the horse has not that fault, or that the warranty did not extend to it, and the demand is dismissed; if you afterwards institute another action against me to rescind the sale, on account of the same fault, I may oppose the exception rei judicatae, although tlie new demand is made in a different form, and aims at a different conclusion, the three requisites already mentioned concur, it is the same horse, eadem res, there is also eadem causa petendi, for the question in both cases is, whether I have warranted against the fault -which you complain of, and the question is between the same parties, the difference of the actions, and of the conditions, does not prevent their having the same object and being eadem res,
 

 . ” 1 M. Pothier, Treatise on the Law of Obligations, Part IV, Chapter III, Section III, Article IV, Section 3 (1826).
 

 Quarles v. Lewis, 226 La. 76, 75 So.2d 14 (1954) reconciles this State’s jurisprudence regarding
 
 res judicata,
 
 firmly establishing that it is the
 
 civilian
 
 doctrine, and not the common law doctrine of
 
 res judicata
 
 that Louisiana applies.
 

 [2]
 

 . “The thing adjudged takes place only with respect to what forms the object of the judgment; and where the defendant contents himself with resisting the demand of the plaintiff, no matter on what ground, the object of the judgment continues to be the demand of the plaintiff. That particular demand, whether allowed or rejected, can never again be urged, hut the fact of its allowance or rejection, no matter on what ground, cannot preclude the bringing forward of another and distinct demand, no matter how closely similar. If I break my neighbor’s fence, and to his suit for damages I plead the nonexistence of any law subjecting me to pecuniary liability in such a case, and the day after being cast in the suit I break the fence again under circumstances exactly similar, and another suit ensues, there will be as close identity between the two suits as between two suits for the taxes of different years; hut we imagine no one would think of applying the law of res judicata to the second suit. If, however, in the first suit, instead of confining myself to denial of plaintiff’s claim, I set up an independent right, justifying my conduct, as that I am owner of the fence in question, or that I have by contract the right to break said fence, then, as a matter of course, as to this defense, if again set up in the second suit, there would be res judicata; but the reason would be that, while urged as a defense, this claim of right would in reality be a demand brought by way of reconvention. I should, pro hac vice, have ceased to be defendant and become plaintiff; and the necessary feature of identity of demand in the two suits would be presented. Exactly when and under what circumstances the defense to a suit passes from the stage of negation, and enters upon that of affirmance, so as to constitute a new demand injected into the suit by way of reconvention, it is not always easy to tell.”
 

 [3]
 

 . In the appropriate case we might be required to decide whether the same “might have been pleaded” standard will be applied to plaintiff and defendant. Plaintiffs are not prohibited by
 
 res judicata
 
 from bringing a second action against the same defendants on the same subject matter if the
 
 cause
 
 is different. ■ Is the application of
 
 res judicata
 
 to be determined solely by
 
 plaintiffs’
 
 cause? That is, if all the juridical facts are placed in evidence and all issues decided on those facts, will the unsuccessful defendant be allowed subsequently to raise a legal defense not pleaded, not placed at issue and not decided in the first suit? Or will the defendant be allowed to raise in subsequent litigation a defense he might have urged without the introduction of new evidence?
 

 Or, must we decide, as suggested in State v. American Sugar Refining Co., supra, and 2 La.L.Rev. 516, whether the
 
 defense
 
 raised in the second suit becomes a
 
 cause,
 
 which, if not identical to the defendant’s
 
 cause
 
 in the first suit, might be raised by him in the second? Note that in Justice Provosty’s fence-breaking example, the plaintiff’s cause is always different in the first and second suits; there are two different torts, each based ou a different destruction of the same fence. Tet, when the defense in the first suit is a
 
 cause
 
 (a contractual right to destroy the fence)
 
 res judicata
 
 bars the re-litigation of defendant’s
 
 cause
 
 in the second suit, in which plaintiff’s
 
 cause
 
 is different. Perhaps the mistranslation in O.O. 2286 of
 
 “cause’’
 
 to “cause of action” which occurred in 1825 (see 2 La. L.Rev. 491 at 496) was not an inadvertence, in which case
 
 res judicata
 
 might apply
 
 only
 
 when there is an identity of “causes of action,” as contrasted to identity of
 
 cause.
 

 Again — is liberative prescription a
 
 cause
 
 which, if not litigated in the first suit, may be utilized by the defendant in subsequent litigation? Liles v. Texas Co., 166 La. 293, 117 So. 229 (1928) is cited for the proposition that a judgment sustaining an exception of prescription bars any subsequent suit on the same cause of action. But when there is no plea of prescription in the first suit, can the defendant in subsequent litigation avail himself of this defense, even though he might have raised it successfully under the facts adduced in the first suit?
 

 [4]
 

 . Both
 
 res judicata
 
 anil prescription are peremptory exceptions, may not be raised by the court and must be specially pleaded. O.C.P. 927. . . .. ,.
 

 [5]
 

 . “(e) Certain common law concepts enumerated as affirmative defenses in Eed. Rule 8(c), such as accord and satisfaction,
 
 laches,
 
 license, and waiver, have been recognized and adopted in varying degrees by the jurisprudence of Louisiana. They have not been expressly included in the enumeration although to the extent that these concepts are recognized in our jurisprudence they are included withín the omnibus phrase ‘any other matter constituting an affirmative defense.’ ” (Emphasis added). Comment (e) to Article 1005 of the Code of Civil Procedure.
 

 [6]
 

 . The redactors’ comments state “ .
 
 the motion
 
 for the rule to show cause sets forth the facts alleged to constitute the constructive contempt.” (Emphasis added).
 

 [7]
 

 . The statute provided, of course, that it was not to affect any existing system of vacation computation which would result in greater benefits than those provided in the statute.